**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Yves Geurden, et al., | No. CV-16-00642-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| Quantum Transportation LP, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff's Motion for Entry of Stipulated Judgment (Doc. 66). Intervenors have responded, (Doc. 68), and Plaintiff has replied (Doc. 69). Plaintiff has also filed a motion to supplement her reply (Doc. 71). The Court now rules on the motions.

**I.　Background**

On October 13, 2014, Vahik Alaverdyan fell asleep at the wheel of his tractor and collided into Vincent Guerden. (Doc. 48 at 2). Geurden died as a result of this collision. (*Id.*) During settlement negotiations, Plaintiff Yves Guerden ("Plaintiff"), demanded $7 million from Defendants Vahik Alaverdyan and Quantum Transportation L.P. ("Defendants"). (Doc. 66-4 at 2). Following this demand, Hallmark American Insurance Company ("Hallmark"), one of Defendants' insurers, sent a letter to the Greenwich Insurance Company ("Greenwich") on February 3, 2017, demanding that Greenwich "tender its policy limits for settlement." (*Id.*) On March 9, 2017, Greenwich wrote two letters denying that it had any "duty to defend and/or indemnify" Defendants at that time.

(Doc. 66-1); (Doc. 66-2). Greenwich further asserted that its insurance policy was excess to policies of other insurers that were currently providing a defense in this litigation. (Doc. 66-1 at 6). In response to Greenwich's letters, Plaintiff and Defendants agreed to enter into a stipulated judgment on June 26, 2017. (Doc. 42). In this stipulation, the parties acknowledged that they were entering into a "Damron Agreement" and requested that the Court grant default judgment. (Doc. 42). On June 28, 2017, the Court inquired whether it had the duty to inquire into the reasonableness of the settlement agreement before entering judgment. (Doc. 43). On July 12, 2017, Greenwich Insurance Company and XL Specialty Insurance Company ("XL") (together, "Intervenors") moved to intervene in this matter, opposing the Court's entry of the stipulated judgment. (Docs. 46 and 47). Believing that neither party's briefs adequately addressed whether Intervenors were entitled to a reasonableness hearing, the Court denied the stipulated judgment without prejudice and ordered supplemental briefing on two issues: (1) when is an excess insurance carrier's duty to defend triggered? And (2) even if such an insurer had no duty to defend, may they recant a prior decision on which the parties relied in reaching a settlement?

**II. Discussion**

    **a. Legal Standard**

When an insurer refuses to defend or denies coverage to its insured, the insured may enter into a settlement agreement with a plaintiff that "admits to liability and assigns to a plaintiff his or her rights against the liability insurer . . . in exchange for a promise . . . not to execute the judgment against the insured." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1022 (Ariz. 2005). In Arizona, these settlement agreements may take two forms: *Damron* and *Morris* agreements. *Id.* at 1022 n.1. *Damron* agreements are entered into because of "an insurer's refusal to defend the insured." *Id.* (citing *Damron v. Sledge*, 460 P.2d 997 (1969)). When parties enter into a *Damron* agreement, the Court does not conduct a reasonableness inquiry. *Parking Concepts, Inc. v. Tenney*, 83 P.3d 19, 22 n.3 (Ariz. 2004). *Morris* agreements, on the other hand, "can be prompted by a number of

circumstances." *Safeway Ins. Co.*, 106 P.3d at 1022 n.1 (collecting cases). Unlike *Damron* agreements, the Court must inquire into *Morris* agreements for their reasonableness. *United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246, 250–51 (Ariz. 1987); *Ariz. Property & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 460 (Ariz. 1987).

Arizona courts explain that these agreements are necessary to protect an insured whenever he is "placed in a precarious position" by his insurer's choice to either defend under a reservation of rights or to refuse to defend altogether. *Safeway Ins. Co.*, 106 P.3d at 1024 ("Even though the insurer is providing a defense to the claim, the insured faces the possibility that any judgment, even one within policy limits, may not be covered by the policy.") (citing *Parking Concepts v. Tenney*, 83 P.3d 19, 22 (2004)). When the insurer makes such a choice, it deprives the insured of the "security from financial loss which he may sustain from claims against him" that he purchased. *Helme*, 735 P.2d at 459. Thus, the law does not require the insured to risk continued exposure "to the sharp thrust of personal liability," but instead allows him to enter into an agreement to protect himself. *Damron*, 460 P.2d 997 at 999 (quoting *Critz v. Farmers Ins. Grp.*, 230 Cal. Rptr. 401, 408 (Cal. Ct. App. 1964)).

At the same time, Arizona courts strive to avoid placing an insurer "between Scylla and Charybdis" by forcing it to "either give up its right to raise tenable coverage defenses or its right to insist on full application of the cooperation clause." *Morris*, 741 P.2d at 251–52 (citing *McGough v. Ins. Co.*, 691 P.2d 738, 745 (Ariz. Ct. App. 1984)). Courts also recognize the danger that an insured might enter into "collusive settlements that bear little relation to the underlying case," because he and the plaintiff have "little incentive to minimize the amount of the [stipulated] judgment." *Leflet v. Redwood Fire & Cas. Ins. Co.*, 247 P.3d 180, 183 (Ariz. Ct. App. 2011). In order to avoid these undesirable outcomes, and to properly balance the equities between insurer and insured, Arizona courts "permit an insurer to raise the coverage defense . . . while at the same time protecting the insurer from unreasonable agreements between the claimant and the insured." *Morris*, 741 P.2d at 252. Thus, a settlement agreement that falls under the

*Morris* rubric will bind the insurer "only if the insurer has declined an opportunity to defend and the insured establishes that the settlement was reasonable and prudent." *Webb v. Gittlen*, 174 P.3d 275, 281 (Ariz. 2008) (citing *Morris*, 741 P.2d at 253).

### b. Anticipatory Breach

Plaintiff first alleges that because XL anticipatorily repudiated *all* of its duties to the insured it is not entitled to a reasonableness hearing. (Doc. 66 at 2). Intervenors disagree and argue that "*Helme* does not support the proposition that an insurer's anticipatory repudiation of its policy obligations permits an insured to enter an unreasonable settlement with the insured." (Doc. 68 at 11). This Court agrees with Intervenors' interpretation of the law.

An insured may enter into a *Morris*-type agreement when his insurer anticipatorily repudiates contractual duties it owes him. *See Helme*, 735 P.2d at 459. However, an insurer's anticipatory repudiation of a contractual duty does not permit the insured to "enter into *any* type of agreement or take *any* type of action that may protect him from financial ruin. . . . The insurer's breach . . . permits him to take reasonable steps to save himself. Among those steps is making a *reasonable* settlement with the claimant." *Id.* at 460 (emphasis added); *see also Safeway Ins. Co.*, 106 P.3d at 1022 n.1 (characterizing *Helme* as a situation giving rise to a *Morris* agreement).

Plaintiff argues that *Helme* stands for the proposition that "once an insurer breaches its duty to its insured by way of a complete denial of coverage and refusal to defend or indemnify, the insured is not required to come back to the insurer for permission to enter a *Damron* agreement." (Doc. 66 at 4). This argument overstates *Helme*'s sweep. Arizona courts have been careful to limit *Damron* agreements to situations where the insurer actually breaches its duty to defend. *See Safeway Ins. Co.*, 106 P.3d at 1022 n.1; *Mora v. Phoenix Indem. Ins. Co.*, 996 P.2d 116, 120 (Ariz. Ct. App. 1999) (explaining that an insurer only forfeits its right to intervene when it commits a "substantial" breach that is "antithetical to the essential purpose of the insurance contract"); *Anderson v. Martinez*, 762 P.2d 645, 649 (Ariz. Ct. App. 1988) (explaining

that only refusal to defend waives an insurer's right to intervene). Therefore, even if an insurer breaches all three of its duties to the insured, the operative duty for purposes of whether a *Damron* agreement is permissible is the duty to defend. *See Mora*, 996 P.2d at 120 (explaining that an insurer asserting no duty to defend its insured, is also implying that it owes no duty to indemnify, and that it therefore has no interest in the litigation). Embodying this careful approach, *Helme* made clear that an insurer's anticipatory repudiation of any of its obligations does not give an insured license to "enter into *any* type of agreement or take *any* type of action that may protect him from financial ruin." *Helme*, 735 P.2d at 460. Rather, an anticipatory repudiation—even of the duty to defend—only allows an insured to enter into "a reasonable settlement with the claimant." *Id.*

Plaintiff further argues that because *Helme* used "the same test for a settlement agreement in the *Damron* case" that it was free to enter into a *Damron* agreement "when XL anticipatorily breached all its obligations to its insureds." (Doc. 69 at 6). Neither *Helme*, nor subsequent cases, support Plaintiff's contention. The applicable passage is:
> [T]he insurer's breach narrows the insured's obligations under the cooperation clause and permits him to take reasonable steps to save himself. Among those steps is making a reasonable settlement with the claimant. So long as that settlement agreement is neither fraudulent, collusive, nor otherwise against public policy, the insured has not breached the cooperation clause.

*Helme*, 735 P.2d at 461. Plaintiff contends that the third sentence in this passage defines the word "reasonable," used in the second sentence, as "neither fraudulent, collusive, nor otherwise against public policy." (Doc. 69 at 6). But, it is more likely that when the court used the words "that settlement agreement" it was referring to the "reasonable settlement" it discussed in the preceding sentence. The opinion more naturally reads as requiring settlement agreements that are reasonable *and* neither fraudulent, collusive, nor otherwise against public policy—the standard used in *Morris*. *Morris*, 741 P.2d at 254. Second, even if it were true that the *Helme* court thought it was applying the test used in *Damron*, subsequent opinions of the Arizona Supreme Court hold that anticipatory

breaches give rise to *Morris* agreements. *Safeway Ins. Co.*, 106 P.3d at 1022 n.1. For these reasons, the Court finds that, even if Intervenors anticipatorily breached their contractual duties, they would still be entitled to a reasonableness hearing.

### c. Trigger

#### i. *Servco* Does Not Apply

Citing no Arizona case law discussing when an insurer's duty to defend is triggered, Plaintiff argues that "[o]ther 9th Circuit courts have examined the issue and determined that the underlying limits of liability need only be tendered, and not actually paid in order to trigger the excess carrier's duty to defend." (Doc. 69 at 3) (citing *Pac. Employers Ins. Co. v. Servco Pac., Inc.*, 273 F. Supp. 2d 1149, 1154 (D. Haw. 2003). First, the Court notes that *Servco* provides little precedential value in this case because that case applied the law of Hawaii, but this Court must apply Arizona law. *Servco*, 273 F. Supp. 2d at 1154. Second, a critical factor in *Servco* was that "no published Hawaii case ha[d] ruled on the meaning of 'exhaustion' in an excess insurance context." *Id.* Arizona courts, on the other hand, hold that "[u]ntil a primary insurer offers its policy limit, the excess insurer does not have a duty to evaluate a settlement offer, to participate in the defense, or to act at all." *Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282, 287 (Ariz. 2003) (citing *Cont'l Cas. Co. v. Royal Ins. Co.*, 268 Cal. Rptr. 193, 197 (Cal. Ct. App. 1990); and then citing *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 700–01 (Tex. 2000)). The Arizona standard for exhaustion requires a primary insurer to *offer* its policy limit, but the excess insurer in *Servco* argued that the duty to defend "is not triggered unless and until the primary carrier pays its limits by either a judgment or settlement of the underlying claim[,]" a stricter standard. *Compare id.*, *and Chartis Specialty Ins. Co. v. Scott Homes Multifamily Inc.*, 2016 WL 9525583, at *6 (D. Ariz. 2016), *with Servco*, 273 F. Supp. 2d at 1154. Thus, the Court finds that *Servco* does not control the outcome of this case.

#### ii. Triggering an Excess Insurer's Duty to Defend

Plaintiff further contends that, under Arizona law, Travis Warriner's letter of

February 3, 2017, triggered Intervenors' duty to defend because it clearly implied "that both Wesco and Hallmark planned to tender their policy limits, and that the damages would reach the XL policy." (Doc. 66 at 7); (Doc. 66-4).[1] Intervenors maintain that, because "an excess insurer's duty to defend is not triggered until the primary coverage is actually exhausted through payment of the claim," (Doc. 68 at 7), their policies were not triggered until the Settlement Agreement of June 21, 2017, and they did nothing to breach their duty to defend after that point. (*Id.* at 8) (citing Doc. 47-6, ¶34).[2]

"An insurer's duty to defend is separate from, and broader than the duty to indemnify." *Quihuis v. State Farm Mut. Auto Ins. Co.*, 344 P.3d 719, 727 (Ariz. 2014). A "primary insurer has the duty to defend until its limits are exhausted." *Columbia Cas. Co. v. U.S. Fidelity & Guar. Co.*, 870 P.2d 1200, 1201–02 (Ariz. Ct. App. 1994). Thus, an excess insurer has no duty to defend its insured unless the primary insurer exhausted its policy limit to defend its insured. *See, e.g.*, *McGough*, 691 P.2d at 744–45 (Ariz. Ct. App. 1984) (concluding it was reasonable for an excess insurer to delay intervening in the defense of its insured until it became apparent that the primary insurer was considering paying its entire policy limit and withdrawing from the case).

The Court has examined the letter of February 3, 2017, and finds that it does not unambiguously inform the excess insurer that the primary insurer was prepared to offer its policy limits to provide a defense, but instead simply informs Intervenors that "Plaintiffs' last settlement demand was $7 million" and that "Greenwich's failure to tender *its* policy limits for settlement is unreasonable." (Doc. 66-4 at 2) (emphasis

---

[1] Plaintiff cites a treatise for the proposition that an excess insurer's coverage is triggered "when a primary insurer . . . is willing to contribute its limit of liability to a settlement and makes that fact known to the excess insurer." (Doc. 66 at 7) (quoting Allan D. Windt, *Insurance Claims and Disputes* § 5:26 (4th ed. 2001)). But this standard only applies to the duty to settle, not to the duty to defend. *See* Allan D. Windt, *Insurance Claims and Disputes* ch. 4 (6th ed. 2018).

[2] Although Intervenors appear to argue that exhaustion requires actual payment, they do not contend that their duty to defend arose on August 31, 2017, when it became clear that the policies had been exhausted. (Doc. 62 at 4). Rather, Intervenors contend their duty arose on June 21, 2017, and that they did nothing to breach their duty after that point. (Doc. 68 at 9).

added). It is certainly difficult to see how a letter from Hallmark's representative demanding that Greenwich tender its policy limits could be construed as an offer from Hallmark to pay its policy limits. In fact, the letter still claims that Hallmark's coverage was excess to Greenwich's policy. (*Id.* at 1). Moreover, the letter provides that "the value of the case [was] possibly . . . in excess of Wesco's and Greenwich's policy limits," but states nothing about Hallmark being prepared to offer its own policy limits to defend the insured. (*Id.* at 2). Furthermore, this letter only demanded that Greenwich "tender its policy limits *for settlement*." (*Id.*) (emphasis added). If this letter triggered any duty at all, it triggered the implied duty to treat settlement offers with equal consideration and the breach of that duty only authorizes an insured to enter into a *Morris* agreement. *Safeway Ins. Co.*, 106 P.3d at 1024 (citing *Helme*, 735 P.2d at 459); *Mora*, 966 P.2d at 120. The first time that Intervenors were actually placed on notice that the primary insurers had offered their policy limits was the June 21, 2017 Settlement Agreement. (Doc. 47-6). Therefore, Intervenors duty to defend arose, at the earliest, on that date, and their subsequent actions did not breach this duty so as to prevent them from receiving a reasonableness hearing under *Morris*.

This result comports with the function of excess insurance policies as well as the purposes of the *Damron*/*Morris* doctrine. Excess insurers do not even have the right to participate in the litigation unless and until the primary policy is exhausted. *Cont'l Cas. Co.*, 268 Cal. Rptr. at 196. And, as the Supreme Court of Texas explained in an opinion cited favorably in *Burke*:

> Excess insurers . . . provide relatively inexpensive insurance with high policy limits . . . . [while] primary carrier[s] generally provide[] a much lower amount of coverage, but must insure against what is likely to be a greater number of claims . . . . Because the primary insurer's duty to defend extends to covered claims without regard to their amount, an excess insurer's duty to defend is not typically invoked merely because a claim has been asserted against the insured in excess of primary limits.

*Keck, Mahin & Cate* 20 S.W.3d at 700–01 (Tex. 2000). That the excess insured has no right or ability to control its insured's defense while the primary insurer is still involved in the case, implicates a core tenet of the *Damron*/*Morris* doctrine. An insurer, by

- 8 -

refusing to defend or defending under a reservation of rights, gives up its exclusive control of the defense of its insured and does so at its own risk. *See Morris*, 741 P.2d at 252; *Mora*, 996 P.2d at 121; *see also Damron*, 460 P.2d at 1001. But, an insurer should not be made to give up that which it does not have. Furthermore, as explained above, Arizona courts have limited *Damron*'s applicability in order to avoid the risk of inflated settlements. *See, e.g.*, *Safeway Ins. Co.*, 106 P.3d at 1022 n.1 (distinguishing *Morris* agreements, which "can be prompted by a number of circumstances," from *Damron* agreements, which require a breach of the duty to defend); *Webb*, 174 P.3d at 281 (stating that *Morris* balanced the competing interests of protecting an insured from liability and protecting an insured from inflated settlements). The very letter that Plaintiff relies on as the crux of her argument provides an illustration of why this concern is warranted. The letter states that "Plaintiffs' last settlement demand was $ 7 million." (Doc. 66-4 at 2). But, the stipulated judgment in this case totals $25 million. (Doc. 66-7 at 2). That amount is five times the policy limit of Greenwich's excess insurance policy. (Doc. 66-1 at 4); (Doc. 66-2 at 3). The Court does not express any opinion regarding the reasonableness of this settlement,[3] but this large amount raises the question of whether the Plaintiff is using the stipulated judgment "to promote the transformation of underlying contract and tort claims into bad faith claims at inflated values." *Leflet*, 247 P.3d at 301. Requiring a reasonableness hearing in this situation strikes the proper balance between the interests of the insurer and the insured, for the insured will still be able to bind the insurer to the damages that "a reasonably prudent person in the insureds' position would have settled for on the *merits* of the claimant's case." *Morris*, 741 P.2d at 254 (emphasis in the original) (citing *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982)).

Accordingly, the Court finds that the duty to defend was not triggered until June 21, 2017, that Intervenors did not breach that duty to defend after that date, and that they are therefore entitled to a reasonableness hearing.

---

[3] Indeed, the letter does contain some evidence that a large settlement valuable may be reasonable, specifically that the defense counsel advised that a jury could award over $24 million in punitive damages alone. (Doc. 66-4 at 2).

### d. The Ability of an Insurer to Recant a Prior Decision on which the Parties Relied.

In response to this Court's second inquiry, the Parties have focused on the issues of waiver and equitable estoppel. (Doc. 66 at 10–15); (Doc. 68 at 12–18); (Doc. 69 at 9–12). Because waiver requires actual intent to abandon or surrender a known right, and Greenwich's letters denying coverage both expressly reserved the right to raise future coverage defenses and conditioned that denial on information learned up until that point in time, waiver cannot operate to bar Intervenors. *See Desert Ridge Resort LLC v. Occidental Fire & Casualty Company*, 141 F. Supp. 3d 962, 970 (D. Ariz. 2015) (finding denial letters that "expressly reserved the right to raise additional grounds for denial as more facts become available" are "inconsistent with an intent to waive the defenses").

"Equitable estoppel applies if (1) the party to be estopped intentionally or negligently induces another to believe certain material facts, (2) the induced party takes action in reliance on its reasonable belief of those facts and (3) the induced party is injured by so relying." *Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcontinetnal Ins. Co.*, 178 P.3d 485, 493 (Ariz. Ct. App. 2008) (citing *Joy Enters., Inc. v. Reppel*, 537 P.2d 691, 594 (Ariz. 1975)). Moreover, the alleged injury or prejudice "must be actual and substantial, and not merely technical or formal." *Weiner v. Romley*, 381 P.2d 581, 583 (Ariz. 1963).

Normally, when disputes over insurance contracts arise, estoppel arguments are raised as between an insurer and its insureds, or between an insurer and a third-party assignee of the insured's claims who stands in the shoes of the insured. *See, e.g., Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 882 P.2d 388, 399–401 (Ariz. 1984) (dispute between insurer and insured); *Pueblo Santa Fe*, 178 P.3d at 492–93 (allowing assignee to assert insured's right to estoppel claim). Here, though, Plaintiff asserts equitable estoppel based on her own detrimental reliance on Greenwich's letters denying coverage because she would not have settled her claim otherwise. (Doc. 66 at 12). She argues that she is even further prejudiced because a reasonableness hearing

might require her to "re-live the gruesome photos of their son's body . . . along with the painful reminders of the punitive aspects of the case." (Doc. 69 at 12). Plaintiff provides that her reliance stems from the fact that "XL provided its denial of coverage letters approximately two weeks prior to the mediation." (Doc. 69 at 10).

First, the Court notes that, under Arizona law, "equitable estoppel is available only as a defense." *Gorman v. Pima Cty.*, 287 P.3d 800, 804 n.4 (Ariz. Ct. App. 2012) (quoting *Tiffany Inc. v. W.M.K. Transit Mix, Inc.*, 493 P.2d 1220, 1224 (Ariz. Ct. App. 1972)). Therefore, it is not clear that Plaintiff can even invoke equitable estoppel in this context. Second, even if Plaintiff can invoke equitable estoppel, the Court finds that her reliance on Greenwich's letters denying coverage was not reasonable. Plaintiff's reliance was not reasonable because, as explained above, Greenwich's letters both expressly reserved the right to raise future coverage defenses and conditioned that denial on information learned up until that point in time. Because these letters did not constitute an absolute and final denial of coverage, which Plaintiff claims she believed they did when she settled, but instead indicated that Greenwich's decision might later change, Plaintiff's reliance on them is not reasonable. *See Guberman v. William Penn Life Ins. Co.*, 146 A.D.2d 8, 13–14 (N.Y. App. Div. 1989) ("Where the insurer expressly states that its assertion of one defense should not be construed as a waiver of other defenses, it is difficult to imagine how, if at all, the plaintiff could have been 'misled . . . into acting on a reasonable belief that the company had waived some provision of the policy.'") (quoting *Kiernan v. Dutchess Cty. Mut. Ins. Co.*, 44 N.E. 698, 699 (N.Y. 1896)). Furthermore, the timing of Greenwich's denial letters is more indicative of a refusal to settle the case, not a refusal to defend the matter altogether—the only circumstance under which a *Damron* agreement is permissible.

Accordingly, the Court finds that neither waiver nor estoppel apply to preclude the Intervenors from recanting a prior denial of coverage and now defending under a reservation of rights.

### III. Conclusion

Based on the foregoing,

**IT IS ORDERED** that the motion to supplement reply to motion for entry of stipulated judgment is **GRANTED** (Doc. 71).[4]

**IT IS FURTHER ORDERED** that the motion for entry of stipulated judgment is **DENIED** (Doc. 66).

**IT IS FURTHER ORDERED** that the settling parties will advise the Court of whether they are proceeding with the settlement by April 11, 2018.

**IT IS FURTHER ORDERED** that if the settling parties decline to proceed with the settlement, they will comply with the following schedule:

    The party with the burden of proof shall disclose experts by May 4, 2018.

    The party without the burden of proof shall disclose its experts by June 4, 2018.

    Rebuttal expert disclosures shall be made by June 25, 2018.

    Discovery shall close by July 25, 2018.

    Dispositive motions are due no later than August 24, 2018.

    Trial shall is set for March 5, 2019.

**IT IS FURTHER ORDERED** that if the settling parties do proceed with their settlement, all parties including the intervenor will comply with the following schedule:

    The party with the burden of proof shall disclose experts by May 4, 2018.

    The party without the burden of proof shall disclose its experts by June 4, 2018.

---

[4] Plaintiff seeks to supplement her motion for entry of stipulated judgment with evidence of Intervenors March 09, 2017, letter to Dole, which contained "reservation of rights language . . . [that] is clear and unequivocal." (Doc. 71-1 at 2). Because of this difference in language, Plaintiff argues that Intervenors' letters to Quantum and Alaverdyan cannot be considered "reservation of rights" letters. (*Id.*) The Court's analysis does not at all rely on characterizing the Intevenors' letters to Quanum and Alaverdyan as "reservation of rights" letters. Therefore, although the Court grants the motion to supplement, the Court finds that the supplemental evidence does not alter its analysis. Furthermore, because the supplemental evidence does not alter the Court's analysis, the Court need not wait to allow Intervenors to respond.

Rebuttal expert disclosures shall be made by June 25, 2018.

Discovery shall close by July 25, 2018.

The parties shall file a joint notice of the estimated length of the reasonableness hearing no later than April 30, 2018.

The reasonableness hearing is set for Tuesday, September 25, 2018.

Dated this 28th day of March, 2018.

_____
James A. Teilborg
Senior United States District Judge